IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| SABRIAN SHUNTE ALEXANDER | § | |
| v. | § | CIVIL ACTION NO. 6:08cv404 |
| JANIS DICKERSON, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Sabrian Alexander filed this lawsuit complaining of alleged violations of his constitutional rights during his confinement in the Rusk County Jail. The parties have consented to allow the undersigned United States Magistrate Judge to issue final judgment pursuant to 28 U.S.C. §636(c). As Defendants, Alexander named jail officers Janis Dickerson, Kevin Bisnett, and Lee Griego.

An evidentiary hearing was conducted on February 12, 2009. At this hearing and in his complaint, Alexander stated that he went into the Rusk County Jail in October of 2006 and left in March of 2007. On December 16, 2006, he said, all of the blankets were taken up to be washed. Before his blanket was returned, he was told that he was being moved from H Tank to J Tank. When he got to J Tank, he saw that all of the inmates already had blankets except for him.

Alexander stated that he pushed the intercom button and asked for a blanket. A few minutes later, he heard Sgt. Janis Dickerson in the hallway, and he told her that he did not have a blanket and would like to get one. Dickerson said that she would talk to Officer Griego to see if Alexander had a blanket when he left H Tank. Dickerson returned shortly thereafter and said that Griego had said that he was "sure" he had packed a blanket with Alexander's property. Alexander said that this was not possible because the blankets had been taken up to be washed before he was moved.

Alexander testified that Dickerson then began questioning him about some contraband which had been found in H Tank. He told her that he did not know anything about the contraband, and

1

Dickerson replied that when Alexander was ready to talk to her about the contraband, she would see about getting him a blanket. Dickerson then left the area. Alexander sat down at a table, but it was very cold in the tank and so after a while, when it became apparent that he was not going to get a blanket, he pushed the intercom button to ask again for one. The intercom call was not answered and so Alexander sat back down at the table.

About ten minutes later, Alexander says, Dickerson and Griego came into the tank, saying that they were going to search it to make sure that Alexander did not have a blanket hidden. The search revealed that there were eight inmates in the tank, and seven blankets. Alexander asked Dickerson if he could please have a blanket because she could see that it was very cold in the tank. Dickerson again began to question him about the contraband items which had been found in H Tank, which Griego had said that he thought belonged to Alexander. He again told Dickerson that he knew nothing about the contraband, pointing out that she should not trust Griego because Griego had said that he had packed a blanket with Alexander's property; Alexander told her that "this turned out to be a lie" and so "who's to say that he isn't lying about finding contraband also." Dickerson then began to criticize him about questioning her judgment about Griego, but Alexander insisted that Griego's honesty "needed to be questioned" because the officer would obviously lie over something as simple as a blanket.

At that point, Alexander says, Dickerson told him that she was going to leave the tank and that he better not push the intercom button again. Alexander replied that he did not want to stay in the tank without a blanket and started to walk out the door. Officer Bisnett stepped out from behind the door and shot him with a Taser gun.[1]

After the initial shot, Alexander says that he stated "that's it," meaning that he did not want to be Tasered any more. Bisnett shot him again, and he fell to his knees, and then to the floor face

---

[1]"Taser" is the tradename for electro-shock guns. These guns fire small dart-like electrodes with attached metal wires; these wires carry electricity which temporarily disrupts nerve ansd muscle function, briefly incapacitating the individual. *See* Gosserand v. Parish of Jefferson, civil action no. 05-5005 (E.D.La., Nov. 7, 2006) (unpublished) (available on WESTLAW at 2006 WL 3247113), slip op. at *1, n.1.

down. He was told to stay on his stomach, but said that the Taser lead were hot and his "heart was hurting." Alexander was then placed in a holding cell.

While in that cell, Alexander says, he received no medical attention even though he complained of chest pains and blisters on his torso. He remained in the holding cell until Monday, December 18, and then was moved to I Tank. He filed several grievances and complained of the lack of medical care, but received no response.

Alexander testified that he wished to bring claims of excessive force and denial of medical care. He states that he had "three or four" seizures and complained of these, but no one did anything. Now that he is in TDCJ, he says, he has been treated with Dilantin and been given scans, and has been told that the seizures cannot be prevented, but only their severity.

On cross-examination at the evidentiary hearing, Alexander acknowledged that he had filed a grievance in 2008 over an incident which had occurred in 2006,[2] but insisted that he had filed one right after the incident; he said that he gave it to an officer named Kay Hollis, but never got it back. Alexander stated that he had never brought up the incident with jail administrator Cassandra Shaw, whom he had known since childhood. He says that he filled out a medical request about chest pain and scars but never received any medication for chest or knee pain; Alexander stated that a later medical request, in January of 2007, was responded to and that he got sinus medications at that time. Alexander also said that he did get pain medication in the form of Tylenol. He stated that there was a certain type of medication which a person was supposed to receive after Tasering, but he did not. Instead, Alexander says, he was given only gauze pads.

Alexander explained that when he tried to leave the tank, he was "just going to stand outside." He insisted that he had filed sick call requests about the seizures and said that other people also reported that he was having seizures. He says that he told Sgt. Berry about the seizures, but that

---

[2] Alexander had previously filed another lawsuit over this incident, but the lawsuit was dismissed without prejudice for failure to exhaust administrative remedies. He then attempted to exhaust his administrative remedies by filing the 2008 grievances. See Alexander v. Dickerson, et al., civil action no. 6:07cv423 (E.D.Tex.).

3

he never mentioned them to Shaw, nor did he complain to Shaw that his grievances were not being answered.

The Defendants have been ordered to answer the lawsuit and have done so. On April 20, 2009, the Defendants filed a motion for summary judgment. In this motion and attached affidavits, the Defendants state that on December 16, 2006, Officer Bisnett was trying out a pipe chase key when he and Officer Griego smelled smoke coming from cell H-12, where Alexander was housed. All of the inmates on H Tank were removed and searched. Alexander was found to have a Bible with a self-rolled cigarette and a razor blade melted onto the handle of a spoon or toothbrush. This was confiscated and the two officers, along with Sgt. Dickerson, then began searching the tank.

During this search, the Defendants say, they discovered that Alexander had torn up his sheet, covered the light, and made necklaces and "do-rags" (head scarves) from the sheet. He had also covered a tin lid which appeared to have come off of a metal domino can; this lid was attached to the wall grate with a piece of wire and appeared to have some sort of residue in it. He had also tampered with the concrete where a stool had been; the Defendants say that it appeared that Alexander had either been smoking or making tattoo ink, both of which were against jail rules.

The Defendants go on to say that all of the contraband was confiscated, and Alexander's property was removed from the tank. He was reassigned to J Tank, where his non-contraband property was returned to him. Normally, the Defendants say, Alexander's actions would have caused him to be assigned to a single cell, but all of the single cells were occupied at that time.

The Defendants state that when Alexander was placed in J Tank, he began complaining about not having a sheet or blanket, growing louder and louder. Dickerson confirmed that he did not have a blanket and said that he would get one, but that he would not receive another sheet at that time because he had destroyed the one which he had. Alexander said that he would take action against her for violating his rights, and she said that withholding the sheet was permitted under Texas jail standards as a result of destructive behavior.

At that point, the Defendants say, Alexander became angry and told Dickerson that he was not "playing a game" and that he would get what he wanted or cause a lot of trouble. He threatened to hold down the intercom button until he got his way, and got closer and closer to Dickerson. The Defendants note that Alexander is six feet tall and weighs 215 pounds, while Sgt. Dickerson is five feet, two inches tall and is 60 years old. The Defendants say that Dickerson repeated "I will get what I want" over and over, in a louder, more aggressive voice, and refused to comply with verbal commands, but instead responded in an aggressive manner. The Defendants state that Alexander was in an eight-man tank and that his actions could have set off the other inmates in the tank.

Because of the escalation of the incident, the Defendants say that Griego told Bisnett to bring the Taser gun to the tank. Meanwhile, Alexander told Dickerson that "he wasn't gonna do a d*Magistrate Judge thing" and that "he was fixing to start some sh*t" if he did not get what he wanted. Alexander then began to walk toward Dickerson and began shouting in her face. Dickerson asked Bisnett if he had the Taser gun and then stepped aside. Alexander shouted "shoot me, I don't ..." and Bisnett shot him. Alexander fell to the floor and then pulled out one of the leads himself. He got up and said "is that all?" He moved toward the officers and Bisnett pulled the trigger again; the Defendants state that Bisnett did not shoot him with the leads again, but administered another jolt with the lead that remained on Alexander's chest and the one which Alexander held in his hand. Alexander stopped his aggressive behavior after the second jolt and was handcuffed by Bisnett. He was placed in a holding cell as soon as the inmate who was in that cell could be removed.

After the Tasering, the Defendants say that Griego, a licensed paramedic, removed the remaining lead. Alexander was provided with Neosporin, silvadine, gauze, and tape to cover the mark. Afterwards, Alexander was examined by Nurse Broyles, who saw nothing out of the ordinary about the Taser marks. Alexander later apologized to Dickerson for "just being stupid," saying that he would "not do that again."

The Defendants state that the Rusk County Jail has a two-step grievance procedure, in which the inmate may file a grievance to the Grievance Board, and may request a hearing before the

Grievance Review Board. If the decision by the Grievance Board or the Grievance Review Board is disputed, the inmate may appeal to the sheriff, who will review the findings and actions by the Board and notify the inmate in writing of the decision within 15 days.

Alexander previously filed another lawsuit concerning this incident, which was dismissed without prejudice for failure to exhaust administrative remedies. After this dismissal, he wrote two letters alleging a "grievance" in an attempt to exhaust his administrative remedies for jurisdictional purposes. Other than these letters, the Defendants say, the only grievance or medical requests which Alexander made were for sinus medication, and these grievances or requests made no mention of being Tasered.

During this time, the Defendants say, no staff member ever witnessed Alexander having a seizure, nor did any other inmate ever report that he was having a seizure. The nurse was never contacted by staff or inmates regarding Alexander's medical condition, nor did she receive any request from Alexander for medical care regarding seizures or any other conditions. Dickerson and Bisnett did not observe anything to make them believe that Alexander had any medical issues regarding the incident.

The jail records show that on December 10, 2006, Alexander sent in a medical request form saying "I have chronic sinus and allergy problems. I have medication in my locker #10 that I would like to have. Thank you." On December 12, he requested sinus and cold medication. On December 15, he sent in a medical request saying that he had sinus problems for which he needed Benadryl, and he had some in his property box; he stated that his eyes were itching as a result of the allergies.

On December 16, 2006, at 6:00 a.m., Alexander sent in a medical request saying that he had chronic allergies and his eyes were itching, for which he needed some Benadryl, and he had some in his property box. This request was sent in on the day of the incident but several hours earlier. The next medical request for is dated December 22, 2006, and says "I need something for sinus and something for pain in my chest and knee." The next day, Alexander requested a Benadryl capsule, and on December 27, he requested blood pressure medication and "something for sinus."

On January 6, 2007, Alexander sent in a medical request saying "I need a Benadryl capsule for sinus." He dated his next request January 8, 2006, but he was not in the Rusk County Jail on that date; this was probably an inadvertent error and was supposed to be January 8, 2007. This request also asked for a Benadryl capsule for sinus problems. The jail medication log shows that Alexander routinely received sinus medication and Tylenol. After the incident, he was also given ibuprofen, and he also received cold packs.

Alexander's grievances and request forms from 2006 and 2007 in the jail records contain no mention of this incident at all. The first such request form after the incident is dated December 27, 2006, and requests the address of Alexander's lawyer, Curtis Stuckey. On December 31, Alexander asked to speak to Sgt. Berry about an unspecified "personal matter," and on January 14, 2007, he wrote to a law enforcement officer with information about an unrelated case.

On July 8, 2008, Alexander wrote to the Court, stating that he was attempting to file a grievance in Rusk County over the incident because the jail did not have a deadline for filing grievances. This is the grievance which Alexander filed after his first lawsuit was dismissed for failure to exhaust administrative remedies. This grievance essentially tracks the statement of facts in Alexander's original complaint.

In their motion for summary judgment, the Defendants argue that the force was used in a good faith effort to maintain or restore discipline and not for the very purpose of causing harm, that he did not show that the Defendants were deliberately indifferent to his serious medical needs because there was no evidence that he notified jail personnel that he had a special need for medical care and no evidence that he ever had a seizure in the jail, and that the Defendants are entitled to the defense of qualified immunity. Alexander did not file a response to the motion for summary judgment.

## Legal Standards and Analysis

### General Standards for Summary Judgment

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Securities and Exchange Commission v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1994); General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P.

To avoid summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning existence of every essential component of that party's case; unsubstantiated assertions of actual dispute will not suffice. Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Fifth Circuit has stated that once the moving party has met its burden, the nonmovant must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a fair-minded jury that it is entitled to a verdict in its favor. ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995).

Summary judgment should be granted when the moving party presents evidence which negates any essential element of the opposing party's claim, including a showing that an essential element of the opposing party's claim is without factual support. First American Bank & Trust of Louisiana v. Texas Life Ins. Co., 10 F.3d 332, 334 (5th Cir. 1994). The granting of summary judgment is proper if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Caldas & Sons v. Willingham, 17 F.3d 123, 126 (5th Cir. 1994). Once the movant makes this showing, the burden shifts to the non-movant to come forward with evidence sufficient to establish the existence of a genuine issue of material fact. Caldas, 17 F.3d at 126-27.

Although the Court must draw all inferences in favor of the party opposing the motion, an opposing party cannot establish a genuine issue of material fact by resting on the mere allegations of the pleadings. Hulsey v. State of Texas, 929 F.2d 168, 170 (5th Cir. 1991); *see also* Gordon v. Watson, 622 F.2d 120 (5th Cir. 1980) (litigants may not oppose summary judgment through unsworn materials). Similarly, a bald allegation of a factual dispute is insufficient, in itself, to create a genuine issue of material fact. Recile, 10 F.3d at 1097 n.15. A non-movant cannot manufacture a factual dispute by asking the Court to draw inferences contrary to the evidence. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In short, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists. Hulsey, 929 F.2d at 170, *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Fifth Circuit has also explained that the burden of overcoming a properly supported motion for summary judgment is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

### The Use of Force Claim

Alexander asserts that the Defendants used excessive force upon him through the use of the Taser gun. The Supreme Court, in Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995 (1992), held that inmates raising allegations of excessive force must show that the force used was malicious and sadistic for the very purpose of causing harm rather than in a good faith effort to restore discipline; the Court also noted that the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." Hudson, 112 S.Ct. at 999. This standard also applies to pre-trial detainees such as Alexander. Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993); Brothers v. Klevenhagen, 28 F.3d 452, 456 (5th Cir. 1994).

In this case, the summary judgment evidence, including Alexander's own testimony, makes clear that the force was applied to him in a good faith effort to restore discipline rather than maliciously and sadistically for the very purpose of causing harm. At the evidentiary hearing, Alexander testified that after Dickerson and Griego came into J Tank, he engaged in a verbal confrontation with the officers, including telling Dickerson that Griego was a liar. He told Dickerson that he did not want to stay in the tank without a blanket, and started to walk out the door. He was then shot with the Taser gun by Bisnett.

The fact that Alexander did not have a blanket did not give him the right to simply walk out of the tank where he was housed, even if it was only to go stand out in the hall as he says. Alexander's testimony makes clear that he was creating a significant security breach by attempting to leave the tank, thus necessitating the use of the Taser gun in order to restore order and discipline. *See also* Whitley v. Albers, 475 U.S. 312, 321 (1986). Alexander's claim of excessive use of force is without merit and the Defendants are entitled to summary judgment on this issue.

## The Medical Care

Alexander also asserts that he was denied medical care for injuries suffered as a result of this incident. However, the medical records do not show that he requested any such care. Alexander made numerous requests for sinus medication, but the records show that he never specifically mentioned being Tasered or being injured as a result; instead, these records show only that on December 22, 2006, almost a week after the incident, Alexander filed a medical request that made an oblique reference to "pain in my chest and knee." He routinely received medication that he requested, including allergy medication as well as pain medication such as Tylenol and ibuprofen. There is no indication in the record that Alexander told anyone that he was suffering from seizures, and he did not file any grievances or request forms making any mention of seizures.

The Fifth Circuit has held that deliberate indifference to a prisoner's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir.

1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293. This standard applies to pretrial detainees as well as convicted prisoners. Thompson v. Upshur County, Texas, 245 F.3d 447, 457 (5th Cir. 2001).

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97,

11

107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

Assuming that Alexander complained of the immediate effects of the Tasering, including pain in his chest and blisters on his torso, as he says, he makes no showing that the jail officials were deliberately indifferent to a serious medical need. The Fifth Circuit has held that a serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. Gobert v. Caldwell, 463 F.3d 399, 345 (5th Cir. 2006); *see also* Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1992) (a medical need is "serious" if it is one which has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention). In this case, the competent summary judgment evidence shows that Alexander was given gauze and ointment for the Taser marks and that these marks were not out of the ordinary for a person who had been shot with a Taser gun. Officer Griego, a paramedic, removed the Taser dart which Alexander had not pulled out himself, and concluded that Alexander had no other injuries. The mere fact of being shot with a Taser gun does not itself show that the individual has sustained a "serious medical need." *See* Biggers v. Lowe, civil action no. 2:05cv1156 (S.D.Ohio, August 10, 2007) (unpublished) (available on WESTLAW at 2007 WL 2326868) (individual shot with a Taser gun suffered a laceration on the hand but not a "serious medical need").

Alexander's single medical request mentioning his chest and knee pain, filed almost a week after the incident, was not sufficient to place the Defendants on notice that he was suffering lingering effects as a result of the Tasering six days earlier. He had ample opportunity to file complaints about the Tasering itself or about any seizures which he may have suffered, but the competent summary judgment evidence shows that he did not do so. While it is true that Alexander's verified pleadings are competent summary judgment evidence, this summary judgment evidence offers only conclusory

allegations, unsubstantiated assertions, or only a "scintilla" of evidence; as such, it is not sufficient to overcome the Defendants' motion. See Little v. Liquid Air Corp., 37 F.3d at 1075.

Similarly, Alexander made no written complaints at all about suffering from seizures, nor is there any record that any other individual advised jail officials that Alexander suffered from seizures. Although Alexander testified that he told the jailers about his seizures, he has not shown that their response to this condition amounted to deliberate indifference to a serious medical need, as opposed to mere negligence or a lack of due care. See, e.g., Davidson v. Cannon, 474 U.S. 344, 347 (1986) (inmate advised guard of threat, which guard negligently disregarded; Supreme Court held that there was no deliberate indifference and thus no claim under Section 1983). While it can be reasonably assumed that seizures are a serious medical need, the only evidence that such seizures ever occurred is Alexander's own unsubstantiated assertion. As stated above, the Fifth Circuit has held that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d at 235. It should be noted that the first mention which Alexander makes of the seizures is in his testimony at the evidentiary hearing; his jail sick call requests and grievances say nothing about seizures, his original complaint in this lawsuit says nothing about seizures, and the letters which he wrote to the jail in 2008 to exhaust his administrative remedies say nothing about seizures. While his testimony was sworn and thus competent summary judgment evidence, it nonetheless offered only conclusory allegations, unsubstantiated assertions, or only a "scintilla" of evidence about this claim, and therefore cannot defeat the Defendants' motion for summary judgment. Alexander's claim that he was subjected to deliberate indifference to his serious medical needs is without merit.

## Qualified Immunity

The Defendants' motion for summary judgment invokes the defense of qualified immunity. The invocation of qualified immunity applies to claims brought against a government official in his individual capacity. The Fifth Circuit has stated that a qualified immunity defense serves to shield a Government official from civil liability for damages based upon the performance of discretionary

13

functions if the official's actions were reasonable in light of then clearly existing law. Atteberry v. Nocona General Hospital, 430 F.3d 245, 253 (5th Cir. 2005), *citing* Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001). To prevail in a Section 1983 lawsuit, a plaintiff must overcome an officer's defense of qualified immunity. *See* McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (noting that when a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense).

The Fifth Circuit has stated that to discharge this burden, the plaintiff must satisfy a two-prong test. First, he must claim that the defendants committed a constitutional violation under current law, and second, that the defendant's actions were objectively unreasonable in light of the law which was clearly established at the time of the actions complained of. Atteberry, 430 F.3d at 253; Kinney v. Weaver, 367 F.3d 337, 349-50 (5th Cir. 2004).

In this case, Alexander has failed to discharge his burden because he has not shown that any constitutional violations were committed, nor that any of the Defendants acted unreasonably in light of clearly established federal law. The Fifth Circuit has specifically held that the plaintiff's burden of overcoming the qualified immunity defense cannot be discharged by conclusory allegations and assertions. Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). In this case, the competent summary judgment evidence shows that force was used on Alexander in a good faith effort to restore discipline, and that Alexander was not subjected to deliberate indifference to his serious medical needs. Alexander has failed to demonstrate the inapplicability of the qualified immunity defense, and so his lawsuit may be dismissed on this basis as well.

## Conclusion

The Court has carefully examined the record in this cause, including all of the Plaintiff's pleadings, testimony, and documents, the Defendants' motion for summary judgment, the competent summary judgment in the record which was submitted by the parties, and all other documents and records in the case. Upon such review, the Court has determined that there are no disputed issues of material fact and that the Defendants are entitled to judgment as a matter of law. The Court has

further concluded that the Defendants are entitled to the defense of qualified immunity from suit. It is accordingly

ORDERED that the Defendants' motion for summary judgment (docket no. 29) is GRANTED. It is further

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice. Finally, it is

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **27** day of **July, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE